## Erie Bank *against* Gibson et al.

The neglect of an obligee or payee to sue the principal when requested by the surety, will not discharge such surety from his obligation, unless the request be accompanied by an explicit declaration by the surety, that if suit be not brought, he will consider himself discharged.

WRIT of error to *Crawford* county.

This was an action of debt on a note by the *Erie Bank* against *John Gibson, William Foster* and *William Magaw.* After the note became due, *William Foster* wrote to the bank thus:

*"Meadville, October 15th,* 1829.

· " Mr *Rufus S. Reed,*

" Some weeks ago Mr *Magaw* received a letter from Mr *M. Sparren,* giving a statement of the amount due the *Erie Bank* on the note of *John Gibson,* for which he and myself are security. We have used every endeavour to get *Gibson* to pay it off, but without effect, unless he has done it lately. We have not seen him for a week or two, as he now lives at Coneaut lake. I saw Mr *Magaw* yesterday, and he desired that I should write to you on the subject. We see no way of securing ourselves from *Gibson,* unless suit be brought against all of us, and when judgment is obtained we will direct the sheriff to make as much of the money from him as we can; the balance we will of course have to pay. If any other course is pursued, we would *lose* the whole of it. The money originally was certainly for *Gibson's* use."

To which the cashier of the bank replied thus:

*" Erie Bank, 2d November* 1829.

" Mr *William Foster,*

" Dear sir,—Mr *Reed* put into my hands yours of the 15th ultimo, wherein you say you see no way of securing yourselves from *John Gibson,* unless suit be brought against all of you; but, my dear sir, when you put your name, as well as Mr *Magaw,* to that paper, you knew, or ought to have known what you were doing. We did not lend the money with the expectation of bringing suit; and when your and *Magaw's* names were to the note, we felt satisfied you would not suffer a suit, nor dreamed of such means to get the money back. I hope you will see this in its proper light, and pay as fast as possible; say send us the half now, and the other half in sixty days."

The following testimony was given by *J. S. Riddle,* Esq.

" Some  time  about  the ' 1st  of  March  1830, Mr  *Hamot*  was  in Meadville, and  requested  me  to  take  the  note  *in  suit  for  collection*. I *told  him  I  wished* first  to  see  *Magaw*  on  the  subject.   I  accordingly called  on  Mr  *Magaw*,  and  told  him  I  had  been  requested  to  collect the  note ; and  asked  him  if  he  meant  to  contest  it.   He  replied  that he  supposed  they  were  bound,  and  must  pay  it.   I  observed  to  him that  if  there  was  to  be  any  controversy  about  it, I  did  not  wish  to  be concerned  against  him.   He  gave  me  to  understand  that  he  would not  go  to  the  additional  expense  of  litigating  it.   I  then  asked  him *if  he  had  any objection  to  my  taking  the  note  for  collection*, and  he said  he  had  not.   I  then  went  back  to  Mr  *Hamot*  and  gave  him  my receipt  for  the  note  for  collection.

" On 'the  same  day,  or  a  few  days  afterwards, I  saw  Mr  *Foster*  in town,  and  mentioned  to  him  that  the  note  had  been  left  with  me. He  complained of  the conduct  of  *John  Gibson*  in  not  having  paid  the note,  but  added  there  was  no  necessity  of  having  a suit  about  it. It  was  proposed  that  a  judgment  bond  should  be  given  by  him, *Gibson*  and  *Magaw*,  and  he  agreed  that  I  should  draw  one,  which  he would  sign,  and  leave  with  me  to  get  the  signatures  of  *Gibson*  and *Magaw*.   Before  I  had  time  to  go  to  my  office  to  draw  one,  he  told me  he  was  desirous  of  going  out  home,  but  would  be  in  town  in  a few  days  again,  and  would  then  sign  the  bond,  and  that  in  the mean  time  I  might  have  an  opportunity  of  seeing  *Gibson*  in  town, and  of  getting  his  name  to  it.

" At  this  time  he  did  not  allege  that  there  had  been  negligence  on the  part  of  the  bank  in  bringing  suit,  nor  that  he  considered  himself exonerated,  until  he  came  to  town  again  some  days  afterwards. ' He then declined  giving  judgment,  alleging  that  the  bank  should  have proceeded  earlier.   The  suit  was  brought  to  the  then  next  term."

The  court  were  requested  to  instruct  the  jury  upon  the  following points.

1.  That  the  mere  omission  by  a  creditor  to  bring  suit  against  the principal  debtor  does  not  discharge  the  surety.

2.  That  the  letter  of  *William  Foster*  to  Mr  *Reed*  did  not  contain that  positive  request  to  bring  suit,  and  was  not  accompanied  by  any such  declaration  that  otherwise  the  sureties  would  consider  themselves  discharged,  which  was  necessary  in  law  to  exonerate  them.

3.  That  if  *John  Gibson*  was  insolvent  at  the  time  the  letter  was written,  the  bank  was  under  no  obligations  to proceed  against  him.

The  court  below  was  of  opinion,  that  the  omission  of  the  bank  to sue  the  principal,  as  requested  by  the  letter  of  *William  Foster*, one  of the  sureties,  was  a  good  defence  against  the  plaintiff's  action,  and  so instructed  the  jury,  who  found  a  verdict for  the  defendant.   And  the opinion  was  assigned  for  error.

*J. S. Riddle*, for  plaintiff  in  error.

It  is  a  conceded  and  well  settled  principle,  that  the  mere  delay  of the  creditor  to sue  the  principal debtor  does  not  exonerate  the  surety,

unless there is an express agreement to give time, or the terms of the contract are varied, or unless the delay has been unreasonable. *Hunt* v. *The United States,* 1 *Gallis.* 34, 35; *Fulton* v. *Matthews,* 15 *Johns.* 433; *Comwith* v. *Wolbert,* 5 *Binn.* 295, 300; *Thursby* v. *Gray,* 4 *Yeates* 518.

If the surety wishes to be freed from his liability, he must make an explicit request to the creditor to proceed, and at the same time give him notice that unless he does so, any further indulgence will be at his own peril. In those states where they have courts of chancery, the correct course of procedure would seem to be, to file a bill in equity, to compel the creditor to bring suit, or be enjoined from proceeding against the surety afterwards. But in Pennsylvania, where we have no court of chancery, a demand *in pais* is held to be sufficient. As, however, it comes in lieu of a bill in equity, it should be equally specific in all material particulars. It should clearly apprise the creditor of what was required of him and warn him of the consequences of neglecting such notice. *Cope* v. *Smith,* 8 *Serg. & Rawle* 116.

In the present case, the letter of Mr *Foster* did not give the explicit notice to which we were entitled, and it does not contain the slightest intimation, that if we did not proceed they would no longer be accountable. He writes, " we see no way of saving ourselves, unless suit be brought, &c." He does not insist on it, nor does he expressly require it; he suggests, it is true, that it would be most expedient for the sureties, but does not tell us, that unless we adopted this suggestion we must no longer look to them. And, if such had been the meaning he intended to convey, it is evident it was not so understood. The reply of Mr *Hamot,* the cashier of the bank, shows the way in which he viewed it. He does not refuse to sue, but says, " we did not expect to be obliged to bring suit, had hoped not to be driven to that alternative, and that defendants would see the matter in its proper light and pay, &c." But suppose he had been told by the sureties, that unless suit was instituted, they would be no longer held—he would then have been put upon his guard, and the presumption is fair, that as a vigilant officer of the bank, he would immediately have directed suit to be brought. It is apparent then, that the defendants were not so understood. Did they intend to convey any such meaning? *Magaw* did not mean to contest it. When Mr *Foster* was called on first, he made no allegation that the bank was in default, he agreed to give his judgment bond for the debt, he requested that process might not be issued, and the reason the bond was not executed, was that he was anxious to go out home before there was time to prepare one. Had he intended then that his letter should discharge him, he would at once have said, the bank has been dilatory, you neglected to sue when called upon, and now we are no longer liable. But nothing of this kind was alleged, and if they themselves did not intend to convey such meaning, would it not be unreasonable to require us so to understand them?

T

[Erie Bank v. Gibson et al.]

The doctrine in *Cope* v. *Smith,* has been fully recognized in *Gardner* v. *Ferrer,* 15 *Serg. & Rawle* 28, 30, in which a check is put upon these constructive equities, which had been carried to such extremes. In this case, too, the defence was put upon the ground, that the money might have been obtained from the principal; but that does not alter the rule.

The law knows no intention between principal and surety, they are both bound to the true interest of the instrument. *Roth* v. *Miller,* 15 *Serg. & Rawle* 100, 107. And it would be error to leave the construction of writings to the jury.

*Foster* and *Wallace,* for defendants in error, cited, 13 *Serg. & Rawle* 159; *Eddowes* v. *Niell,* 4 *Dall.* 144; *Cope* v. *Smith,* 8 *Serg. & Rawle* 110; *Pain* v. *Packard,* 13 *Johns.* 174; *Fulton* v. *Matthews,* 15 *Johns.* 433; *King* v. *Baldwin,* 17 *Johns.* 384; *Walker* v. *Bank,* 12 *Serg. & Rawle* 382; *Bank* v. *Walker,* 9 *Serg. & Rawle* 229.

The opinion of the Court was delivered by

ROGERS, J.—In *Cope* v. *Smith,* 8 *Serg. & Rawle* 110, Chief Justice *Tilghman* investigated with great care all the authorities which bear upon the present question. In England, the surety must go into chancery, to compel the creditor to sue, or perhaps the principal to pay, but in New York the same result may be produced by a request *in pais.* This position is sustained by the court of errors, contrary to the opinion of all the law judges, except Chief Justice *Spencer.* The law was at one time supposed to be otherwise in Pennsylvania. In the *Commonwealth* v. *Wolbert,* Justice *Yeates* says, "a bill will lie in chancery, by a surety to compel a creditor to sue his principal; and equity will act on the refusal, or neglect to sue, particularly when the condition of the surety is thereby deteriorated. The surety has no such remedy here, he must pay the money on the bond, and take an assignment. Should he demand a suit against the principal, I should hold him bound to tender an indemnification." But in *Cope* v. *Smith,* the court came to a different conclusion, by dispensing with the necessity of an actual payment of the money by the surety. In that case, the attention of the chief justice, who delivered the opinion of the court, was directed to the rule most proper under the peculiar circumstances of the jurisprudence of this state. The result was, that a medium course was adopted, not so lax as the rule finally settled in New York, and that with me, is no slight recommendation. In *Cope* v. *Smith,* it was held, that the mere omission by a creditor to bring suit against the principal debtor, does not discharge the surety; but that if a creditor, after being requested to bring suit against the principal debtor, refuse, or neglect to do so, the surety is discharged; but the rule then laid down, has this important qualification, provided the request be proved clearly, and beyond all doubt; and provided, it be accompanied with a positive, explicit declaration, that unless the request be complied with, the surety

[Erie Bank v. Gibson et al.]

will be considered discharged. I am reconciled to the rule, by the fact that we have no court of chancery; for if we had one, I would compel the surety to seek his remedy there. No request or demand *in pais,* however solemn, and accompanied with whatever declaration, should discharge the surety from his responsibility. In laying down the rule for the government of suitors, the court thought proper to guard the exercise of the right with these restrictions and limitations, and these I do not feel inclined to disregard. A clear, distinct declaration, that unless the request of the surety to sue principal is complied with, he will consider himself discharged, seems to put the creditor on his guard. It evinces a determination on his part to exonerate himself from liability. It is then at the peril of the creditor, either to neglect or refuse to comply with the request; nor is this any hardship, as, according to the case of the *Commonwealth* v. *Wolbert,* he may require an indemnity ; or according to *Gardner* v. *Ferrer,* he may offer the surety the right to bring suit in his name. That the court have heretofore been understood as establishing this rule, as I have stated it, appears from *Gardner* v. *Ferrer,* 15 *Serg. & Rawle* 28. It has undergone repeated discussions in this court. The chief justice says, in the case referred to, "I would be unwilling," (and in this I agreed with him at the time, and do so yet) "in cases of this sort, to go beyond the rule, in *Cope* v. *Smith,* 8 *Serg. & Rawle* 110, that the surety shall be exonerated only when the obligee has refused to bring suit, or, (what I take to be the same thing) to suffer the surety to do it in his name, after a positive request, and explicit declaration by the surety that he would otherwise hold himself discharged."

After two such recognitions of the rule, there should be some stronger reason than has been given for a change. It is not sufficient to show that in New York it has been decided differently, in opposition to the opinion of the legal talent of the supreme court of that state, (the chief justice excepted) and also plainly to the rule established in England. The rule, as settled here, carries with it this powerful recommendation. It is explicit, and of course easily understood, and is eminently calculated to prevent surprise. If any exception can be taken to it, it is that the court did not authoritatively require that the notice should be in writing. The letter of Mr *Foster* contains a request, sufficiently explicit to come within the meaning of *Cope* v. *Smith,* to bring suit against the principal; but there is no intimation, that unless suit was brought, *Magaw* and he would consider themselves discharged. It is true, they allege that to be the only means of securing themselves ; but that is not sufficient. In the answer of the cashier, he declines complying with the request, and says, with great reason, as I think, that the bank did not lend the money with the expectation of bringing suit, and when they, *Foster* and *Magaw's* names, were to the note, the bank felt satisfied, they would not suffer a suit, nor did they dream of such a means of getting rid of paying the money. He adds, I

hope you will see this in its proper light, and pay, as fast as possible; say, send us the half now, and the other half in sixty days. It is evident that the bank had no intention to discharge the security, nor idea that this would be the legal effect of their refusal; nor could they suppose so, if they were aware, as they are presumed to be, of the case of *Cope* v. *Smith.* To this letter they received no reply. If the sureties intended to insist on a suit, at the risk of the creditor of discharging them from liability, their course was plain. They should then have put the bank on their guard, by demanding it as a right, under the penalty which would result from a refusal. To discharge them, without this, is evidently taking the bank by surprise, and this it is the object of the rule to prevent. In truth, this case is a strong illustration of the wisdom of the rule. The creditor has rights as well as the surety, and this it ought to be the object of all well regulated societies to guard. There is a danger in impairing securities of this kind. At least creditors are entitled to a fair protection, not only as against the principal, but his sureties. It is frequently on the faith of the latter that the creditor relies, without which the loan would not be afforded. As the bank had no idea, neither had *Foster* and *Magaw*, that the liability had ceased, and this appears beyond question, in the testimony of Mr *Riddle*. As late as the 1st of March 1830, Mr *Riddle* called on *Magaw*, and told him he had been requested to collect the note, and asked him if he meant to contest it. He replied, he supposed they were bound, and must pay it. He did not wish to go to the additional expense of litigating it. Mr *Riddle* afterwards spoke to Mr *Foster* about it. Mr *Foster* complained of the conduct of *Gibson*, but added, there was no necessity of any suit about it. It was agreed that *Gibson, Foster* and *Magaw* should give a judgment bond for the money. At that time they did not allege that the bank had been guilty of negligence, nor that they considered themselves exonerated. Some days afterwards *Foster* declined giving a judgment, saying, that the bank should have proceeded earlier. If *Magaw* and *Foster* should succeed in the defence, it will be a confirmation of the truth of the observation of Chief Justice *Gibson* in *Gordon* v. *Ferrer*, "that courts of equity have gone to an extreme in favour of sureties, often granting relief for a constructive equity, the existence of which the surety did not even suspect."

The counsel for the defendant in error say, it is against equity for a creditor to refuse to bring suit against the principal. However true this may be as a general proposition, I doubt its truth here. It seems to me it would have been against equity, because contrary to their engagement, for the sureties to have insisted on the bank's bringing suit against *Gibson*. It is very well known that the bank looks to the payment of money loaned, at the maturity of the bill. That is a course of dealing which is absolutely necessary to their prosperity, and with which their customers are, or are supposed to be, well acquainted. There was, therefore, a propriety in the an-

swer of the cashier of the bank, which is in conformity to the ordinary course of mercantile dealing. If this had been a note drawn in the ordinary form, there would be no doubt of this, but, in substance, the contract is the same, and was so understood, by at least one of the parties, to which the other did not dissent. The only difference is, that instead of drawing the notes payable to order, and indorsing them in the ordinary form, the sureties sign their names to the note itself, in which they promise to pay. Although this note may not have been strictly negotiable, (and whether it was or not we cannot say, it not being produced) it partakes of that character, so far as regards this question.

Judgment reversed, and a *venire de novo* awarded.